AO 91 (Rev. 5/85) Criminal Complaint                    AUSA Robert H. Waters/ S/A Seth Berger, ATF

# United States District Court

FILED by _____ D.C.

**MAY 2 8 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

_____SOUTHERN_____ **DISTRICT OF** _____FLORIDA_____

UNITED STATES OF AMERICA

v.

JUAN HERNANDEZ, a/k/a "Jr.,"
WILLIAM NAVARRO, a/k/a "Oso,"
JONAH BRIER, and
AMANDA DIMURO

## CRIMINAL COMPLAINT

CASE NUMBER: 09-8141-AEV

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In or about _September 2008 thru May 28, 2009_ in _Palm Beach_ county, in the _Southern_ District of _Florida_ defendant(s) (Track Statutory Language of Offense)

did knowingly and intentionally combine, conspire, confederate and agree with one another and other persons unknown at present, to possess with intent to distribute five (5) kilograms or more of cocaine, and did carry a firearm in connection with drug trafficking activity.

in violation of Title(s) _21; 18_ United States Code, Section(s) _841(a)(1), 841(b)(1)(A), 846; 924(c), 2_ .

I further state that I am a(n) _Special Agent with ATF_ and that this complaint is based on the following facts:

Please see attached Affidavit.

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

S/A _____
Signature of Complainant
Seth Berger, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me and subscribed in my presence,

_May 28, 2009_
Date

at   West Palm Beach, Florida
City and State

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT

I, Seth Berger, being duly sworn, do state and attest as follows:

1.    I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since July of 2001. I am currently assigned to the West Palm Beach resident office of the ATF. I have received specialized training regarding the investigation and enforcement of federal firearms violations and have conducted numerous investigations regarding individuals who unlawfully possess one or more firearms during and in relation to a drug trafficking crime as well as investigations of individuals who possess or conspire to possess with the intent to distribute narcotics.

2.    I have learned the following information from first-hand observations in my official capacity, along with information received from other law enforcement officers as well as non-law enforcement sources. This affidavit is submitted for the limited purpose of establishing probable cause that Juan HERNANDEZ, a/k/a "Jr.," William NAVARRO, a/k/a "Oso," Jonah BRIER and Amanda DIMURO conspired to possess with the intent to distribute fifteen kilograms or more of cocaine and carried and used firearms during the commission of a drug trafficking offense, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846 and Title 18, United States Code, Sections 924(c) and 2. Because this affidavit is for the limited purpose of setting forth probable cause only, it does not contain every fact known to me about the investigation.

3.    In September of 2008, your affiant met with Palm Beach County Sheriff's Office (PBSO) Agents Rich Angelo and Carlos Ribeiro, and a confidential informant (herein after referred to as a CI). The CI told Special Agent Berger that approximately 2 to 3 weeks earlier, the CI was

1

speaking with Amanda DIMURO. The CI stated that DIMURO asked the CI what the CI needs, and the CI told DIMURO that the CI needs some work (referring to drugs). The CI stated that the CI told DIMURO that the CI was looking to get approximately 2 to 3 ounces of crack cocaine from DIMURO, and DIMURO discussed with the CI that it would be approximately $800 an ounce. The CI told DIMURO that the CI would contact DIMURO when the CI had the money together to buy the drugs from DIMURO.

4.  The CI stated that while the CI and DIMURO discussed this crack cocaine transaction, DIMURO mentioned to the CI, that she (DIMURO) had some "licks" (referring to home invasions) lined up. The CI stated that DIMURO said she has 5 crazy guys she normally does the home invasions with but was looking to find some new crew members because she doesn't trust them, as some of the crew members were recently arrested on federal drug charges.

5.  On October 30, 2008, the CI made a controlled call to DIMURO to set up a 3 ounce buy from DIMURO of crack cocaine. When the CI asked DIMURO if she could come up with the 3 ounces of crack cocaine, DIMURO responded, "OK and then I'll do that for you, but then you gotta give somebody up for me." The CI responded, "What?" DIMURO responded," You need to give me somebody I can rob then and I'll get them (referring to the 3 ounces of crack cocaine) for you."

6.  When the CI asked DIMURO if she could come up with the 3 ounces of crack cocaine by the afternoon on October 30, 2008, DIMURO stated, "Um well alright, I'll see what I can do about the 3, come up with a fucking lick (referring to a victim to do a home invasion on) for me and I'll come up with 3 ounces."

7.  On November 6, 2008, a PBSO U/C Agent purchased 3 ounces of crack cocaine from

2

DIMURO. After the deal DIMURO again mentioned to the CI about doing a home invasion. On November 10, 2008, the CI made a controlled call telling DIMURO that the CI wanted to introduce DIMURO to an individual (ATF Special Agent McKean) who needs a big lick done. The CI explained to DIMURO that Special Agent McKean wanted to meet with DIMURO in person about doing a home invasion and to further discuss DIMURO's interest in conducting an armed robbery for cocaine.

8.     On November 13, 2008, Special Agent McKean and the CI picked up DIMURO at her residence and drove to a parking lot area of a Wendy's restaurant located near the 4400 block of Cherry Road, West Palm Beach, Florida.

9.     Special Agent McKean then advised DIMURO that he was a disgruntled narcotics courier for a Colombian narcotics organization. Special Agent McKean described his relationship to the organization as a long-time courier of approximately one or two kilograms of cocaine per trip for the Colombians. Special Agent McKean advised DIMURO that he was experiencing financial difficulties. Special Agent McKean said that when he approached the organization requesting a loan, he was rebuffed. Therefore, Special Agent McKean stated he was attempting to locate individuals who could rob cocaine from the organization. Special Agent McKean added that the CI had advised him that DIMURO knew people who could execute the robbery.

10.     Special Agent McKean then stated that when he was dispatched to transport the one or two kilograms of cocaine, he would observe at minimum fifteen to twenty kilograms of cocaine at the "stash" house. Special Agent McKean stated that there was one individual armed with a 9mm pistol guarding the cocaine and a second subject who Special Agent McKean surmised was not

3

armed. Special Agent McKean stated his involvement in the robbery needed to be cloaked due to the fact the Colombians knew his family. Special Agent McKean asked DIMURO for five kilograms of cocaine as payment for his involvement in the robbery.

11.    DIMURO asked how many people would be inside the stash house and Special Agent McKean reiterated that there would be two people guarding the cocaine.

12.    DIMURO stated that the best option would be to put a gun in the back of another courier who arrived at the stash house in order to conceal Special Agent McKean's involvement in the robbery from the organization.

13.    DIMURO stated "We will have to be strapped (armed with a gun)" and said that Special Agent McKean would have to be laid down on the ground and robbed during the commission of the drug robbery to again conceal Special Agent McKean's involvement in the robbery.

14.    DIMURO stated she could recruit as many people as necessary to commit the robbery but stated that she would only need two or three individuals to overcome the one armed guard and the second subject inside the stash house. DIMURO said "It won't take a squad".   DIMURO stated that she would have to consider who she felt was qualified for the job and agreed to contact the CI to set up a future meeting where all parties could further discuss the proposed robbery. DIMURO confided in the CI that she wanted to wait until her boyfriend Juan HERNANDEZ got out of jail to ensure that she got her fair cut, and to ensure the robbery would go as planned.

15.    HERNANDEZ was released from jail on or about March 6, 2009, and days later told the CI that he wanted to find out more about Special Agent McKean's home invasion and wanted to

4

speak to Special Agent McKean right away about doing it.

16.     On or about March 9, 2009, Special Agent McKean spoke to HERNANDEZ briefly on the phone. HERNANDEZ was very interested in meeting with Special Agent McKean and wanted to meet right away.

17.     On March 13, 2009, Special Agent McKean, acting in an undercover capacity, accompanied by the CI, arrived at 4483 Gulfstream Road, Lake Worth, Florida for a scheduled meeting with JUAN HERNANDEZ to discuss a proposed robbery for cocaine.

18.     Special Agent McKean parked his vehicle in front of an apartment and the CI exited Special Agent McKean's vehicle and called HERNANDEZ. A few moments later HERNANDEZ exited an apartment unit and introduced himself to Special Agent McKean.

19.     During the recorded meeting, Special Agent McKean advised HERNANDEZ that he had spoken to HERNANDEZ'S girlfriend, AMANDA DIMURO, approximately three months before regarding the proposed robbery for cocaine.

20.     Special Agent McKean advised HERNANDEZ that he was a disgruntled courier of narcotics for a Colombian narcotics organization who would transport one or two kilograms of cocaine at a time for the organization. Special Agent McKean stated that shipment of cocaine arrived approximately once every month or two and that when he was dispatched to pick up the cocaine, he would observe at minimum fifteen kilograms of cocaine inside the stash house.

21.     Special Agent McKean stated his child had become ill and when he approached the organization requesting a loan, but was rebuffed. HERNANDEZ stated that DIMURO had told him that Special Agent McKean's child had become sick and that he did not understand how the drug

5

organization could treat Special Agent McKean with such disrespect. HERNANDEZ asked Special Agent McKean if he still had dealings with the drug organization and Special Agent McKean responded affirmatively.

22.     Special Agent McKean stated that there were at least two individuals guarding the cocaine inside the stash house and that other couriers also arrived at the stash house to pick up cocaine for transport. HERNANDEZ stated that he would have two or three armed accomplices that would assist him with the execution of the robbery.

23.     HERNANDEZ stated that Special Agent McKean could meet with him after the robbery to receive his share of the proceeds from the robbery. Special Agent McKean again guaranteed that there would be at least fifteen kilograms of cocaine present inside the stash house and stated he was seeking five kilograms of cocaine as payment for his involvement in the robbery.

24.     HERNANDEZ assured Special Agent McKean that he would receive his share of the proceeds from the robbery and stated that if there were thirty kilograms of cocaine inside the stash house, Special Agent McKean would receive ten kilograms as payment.

25.     HERNANDEZ stated that the robbery would be done right and added that he would follow a courier inside the stash house and pistol whip him. HERNANDEZ stated he would tie everyone up and "mask them up".

26.     Special Agent McKean stated that he would drive into the garage of the stash house in order to load the cocaine for transport. HERNANDEZ stated that he and his associates would then follow Special Agent McKean into the stash house. HERNANDEZ guaranteed that Special Agent McKean would not be harmed and added that he would also steal Special Agent McKean's rental car

in order to conceal Special Agent McKean's involvement in the robbery. HERNANDEZ said "I'll do it right".

27.     Special Agent McKean told HERNANDEZ he wanted to meet his associates prior to the execution of the robbery and HERNANDEZ agreed.

28.     Special Agent McKean reminded HERNANDEZ that one of the guards would be armed with a 9mm pistol. HERNANDEZ stated he and his two associates would all be armed during the commission of the robbery, and therefore would be able to over power the armed guard.

29.     HERNANDEZ advised Special Agent McKean to call the CI when he wanted to meet again and meet his associates. The meeting was then concluded.

30.     On March 20, 2009, ATF Special Agent McKean, acting in an undercover capacity, arrived at a Hooter's restaurant located at 6345 N. Andrews Avenue, Fort Lauderdale, Florida, for a scheduled meeting with the CI, HERNANDEZ, DIMURO and another unknown subject to further discuss a proposed robbery for cocaine.

31.     During a recorded meeting, HERNANDEZ advised Special Agent McKean that after the robbery was successfully executed, he needed Special Agent McKean to provide him with kilogram quantities of cocaine on a regular basis. HERNANDEZ stated that DIMURO would sell the cocaine for him.

32.     HERNANDEZ and the other subject then discussed methods of entry into the stash house to successfully execute the robbery. HERNANDEZ then warned Special Agent McKean that if one of the guards resisted during the robbery, "they might die".

33.     HERNANDEZ stated that everyone inside the stash house would be tied up during the robbery. HERNANDEZ added that he was going to steal Special Agent McKean's vehicle to conceal his involvement in the robbery.

34.     DIMURO asked Special Agent McKean if the guards closed the garage door when Special Agent McKean entered the stash house.   Special Agent McKean responded in the affirmative.

35.     HERNANDEZ and this other subject continued to discuss methods of assaulting the stash house and HERNANDEZ warned Special Agent McKean that he would possibly be hit by them during the robbery to conceal his involvement in the robbery. HERNANDEZ added that he would utilize a black bag to carry the kilograms of cocaine out of the stash house.

36.     HERNANDEZ stated he was extremely motivated to conduct the robbery immediately. Special Agent McKean reiterated a guarantee that there would be at minimum fifteen kilograms of cocaine inside the stash house and that he was seeking five kilograms for his involvement in the robbery.  Special Agent McKean asked for an even split of the proceeds for all kilograms exceeding fifteen and all the parties agreed it was a fair request.

37.     HERNANDEZ stated that DIMURO would be set up in a house in western Broward County to sell his share of the cocaine.

38.     Special Agent McKean was advised that DIMURO would be the getaway driver during the robbery and that the CI would act as a lookout.

39.     Special Agent McKean offered to provide a getaway vehicle which all the parties agreed to accept. S/A McKean then warned the subjects not to get arrested prior to the proposed

8

robbery. Special Agent McKean also clarified that there would not be any cash located inside the stash house.

40.     HERNANDEZ stated that they "lived" to conduct robberies. HERNANDEZ and this other subject stated that they could sell their share of the cocaine and HERNANDEZ stated he would sell his share in ounce quantities to maximize his profits.

41.     HERNANDEZ asked Special Agent McKean if he could obtain an AR-15 assault rifle and Special Agent McKean responded negatively. HERNANDEZ and this other subject stated that they had one firearm and were looking for one more to conduct the proposed robbery.

42.     HERNANDEZ stated he would sell one kilogram of cocaine immediately to make quick cash after the robbery. HERNANDEZ said he could move cocaine quickly and offered to sell Special Agent McKean's share of the cocaine from the robbery if Special Agent McKean had problems selling his share. HERNANDEZ stated he could sell kilograms to Mexicans for $21,500 per kilogram. HERNANDEZ and DIMURO then spoke about pricing for ounces of cocaine.

43.     DIMURO stated that she would be the getaway driver for the robbery and added that it was not the first time she had acted as such. DIMURO told Special Agent McKean that she had been arrested for armed burglary. DIMURO then asked Special Agent McKean to describe the neighborhoods in which the stash houses were usually located and Special Agent McKean stated that they were usually located in nice neighborhoods.

44.     Special Agent McKean stated that if the parties were not prepared to conduct the robbery when the next shipment of cocaine arrived, they could let it pass and wait for another shipment. The meeting was then concluded.

9

45.     During a recorded phone conversation on April 5, 2009, Special Agent McKean advised HERNANDEZ that a shipment of cocaine was scheduled to arrive in the next few days. HERNANDEZ stated he would call his associate to confirm his availability to commit the robbery for cocaine.

46.     During a recorded conversation on April 7, 2009, Special Agent McKean told HERNANDEZ that he was disappointed that HERNANDEZ was not ready to commit the robbery. HERNANDEZ explained that he had obtained the firearms to commit the robbery and that he and AMANDA DIMURO had planned on renting a hotel room in Broward County in order to be closer to the suspected stash house location. HERNANDEZ said that the other subject was too scared to commit the robbery and that the robbery was too sophisticated for him.

47.     HERNANDEZ asked Special Agent McKean if he knew anyone who could assist him with the robbery and Special Agent McKean responded negatively. Special Agent McKean told HERNANDEZ that they could wait for a subsequent shipment of cocaine to arrive and HERNANDEZ agreed. HERNANDEZ added that he had an associate that would be released from jail shortly who would be willing to commit the robbery with him. The conversation was then concluded.

48.     On May 5, 2009, Special Agent McKean was advised by a CI that HERNANDEZ wanted to speak to him about the previously discussed proposed robbery for cocaine. Phone conversations with HERNANDEZ were recorded by Special Agent McKean in which it was agreed that a meeting would take place the following day in Fort Lauderdale, Florida to further discuss the proposed robbery and for HERNANDEZ to introduce his new associate to Special Agent McKean.

10

49.     On May 6, 2009, HERNANDEZ initially stated in phone conversations with Special Agent McKean that he would meet with Special Agent McKean in Fort Lauderdale, Florida. HERNANDEZ later called and cancelled the meeting stating that his associate could not locate his car keys. Special Agent McKean told HERNANDEZ to call him the following week if he was interested in meeting to further discuss the proposed robbery for cocaine.

50.     On May 13, 2009, HERNANDEZ called Special Agent McKean seeking a meeting. Special Agent McKean subsequently recorded a phone call from HERNANDEZ in which he advised HERNANDEZ he would call him later in the week.

51.     On May 17, 2009, HERNANDEZ returned a call from Special Agent McKean and during a recorded conversation agreed to meet with Special Agent McKean on May 19, 2009.

52.     On May 18, 2009, HERNANDEZ called Special Agent McKean and scheduled a meeting for the following afternoon at a Hooter's restaurant in Ft. Lauderdale, Florida.

53.     On May 19, 2009, HERNANDEZ called Special Agent McKean to confirm their scheduled meeting later in the day.

54.     Later the same day, Special Agent McKean, acting in an undercover capacity, arrived at a Hooter's restaurant located at 6345 N. Andrews Avenue, Ft. Lauderdale, Florida, for a scheduled meeting with HERNANDEZ, BRIER and NAVARRO to further discuss a proposed robbery for cocaine. This meeting was audio and video-taped. HERNANDEZ proceeded to introduce BRIER and NAVARRO to Special Agent McKean. HERNANDEZ and NAVARRO then entered the restroom and Special Agent McKean asked BRIER if HERNANDEZ had spoken to him about the proposed robbery for cocaine. BRIER stated that HERNANDEZ had told him "some stuff

11

about it".

55.     HERNANDEZ and NAVARRO returned to the table and HERNANDEZ told BRIER and NAVARRO that Special Agent McKean would explain everything they needed to know about the proposed robbery for cocaine.

56.     HERNANDEZ then told BRIER that he (BRIER) would act as a getaway driver and that HERNANDEZ and NAVARRO would execute the robbery. HERNANDEZ stated he would steal Special Agent McKean's vehicle and use it as a getaway vehicle. HERNANDEZ then told Special Agent McKean that five or six hours later he would be able to pick up his share of the cocaine from them.

57.     NAVARRO told Special Agent McKean that he would have to make him "bleed" in order to disguise Special Agent McKean's involvement in the robbery.

58.     BRIER asked how much cocaine would be inside the stash house and Special Agent McKean guaranteed a minimum of fifteen kilograms of cocaine would be present. Special Agent McKean asked for five kilograms of cocaine as payment for his involvement in the robbery and a 50/50 split of all kilograms over fifteen present inside the stash house. None of the subjects objected.

59.     NAVARRO asked if there would be cash inside the stash house and HERNANDEZ stated that there would be no cash inside. HERNANDEZ repeated that he and NAVARRO would enter the stash house and BRIER would drive the getaway car and utilize his vehicle to block any vehicles parked in the garage. HERNANDEZ stated that they would successfully execute the robbery in approximately two minutes.

12

60.     NAVARRO asked Special Agent McKean to describe the guard inside the stash house. Special Agent McKean described the guard as being heavyset and armed with a 9mm pistol. NAVARRO asked Special Agent McKean if he thought Francisco would discharge his weapon and Special Agent McKean responded affirmatively. NAVARRO stated that he may have to shoot the guard.

61.     BRIER then suggested that NAVARRO utilize a .22 caliber pistol in order to not draw attention to their robbery in case shots were fired. HERNANDEZ stated if shots were fired they would have to accelerate the pace of the robbery. NAVARRO stated that he had been shot at from close range in the past.

62.     HERNANDEZ, NAVARRO and BRIER all guaranteed that Special Agent McKean would receive his share of the cocaine from the proposed robbery and that Special Agent McKean would not be harmed during the commission of the robbery.

63.     HERNANDEZ stated that he was attempting to procure two bullet proof vests for use during the commission of the robbery. HERNANDEZ stated that he would obtain two different hotel rooms the night prior to the robbery. HERNANDEZ stated that AMANDA DIMURO possibly would drive another getaway vehicle. HERNANDEZ added that he and his associates would assault the stash house as Special Agent McKean was leaving the premises after receiving his cocaine for transport.

64.     HERNANDEZ reiterated that he and NAVARRO would be on foot and posted on each side of the garage door of the stash house. As the garage door opened for Special Agent McKean to exit the stash house, HERNANDEZ stated he would "lay down" the guard and would

13

utilize one of the three or four pairs of handcuffs he would possess. HERNANDEZ added that he would use the guard as a shield if necessary to neutralize the second guard in the stash house if present.

65.     NAVARRO asked Special Agent McKean if he knew what neighborhood the stash house was located in and Special Agent McKean advised that the Colombian narcotics organization utilized different residences to store their cocaine. NAVARRO asked Special Agent McKean if the cocaine was of high quality and Special Agent McKean stated it was good Colombian cocaine.

66.     NAVARRO asked if the guards wore jewelry and Special Agent McKean responded affirmatively. HERNANDEZ told NAVARRO not to worry about the guard's jewelry and that he (HERNANDEZ) would purchase $4,000 worth of jewelry for NAVARRO from his proceeds from the robbery if it was successful.

67.     HERNANDEZ stated that the person he had previously approached to conduct the robbery later identified as (CHRISTOPHER WHITE) backed out on him at the last minute when the shipment had arrived in April.

68.     HERNANDEZ stated he would not utilize the CI for the robbery because the CI was of no use to him. BRIER asked Special Agent McKean if he was armed when transporting cocaine for the organization and Special Agent McKean stated he carried a 9mm pistol. BRIER stated he had a 9mm Smith and Wesson pistol for which he had a concealed weapons permit. NAVARRO also stated he had a 9mm pistol but inferred he was prohibited to possess firearms. Special Agent McKean asked HERNANDEZ if he was ready to commit the robbery and HERNANDEZ said he was. Special Agent McKean asked the subjects if they needed a getaway vehicle and all of the

14

subjects accepted his offer. Special Agent McKean again asked if there were any objections to him receiving at least five kilograms of cocaine as payment for his involvement in the robbery and there were no objections.

69.     HERNANDEZ told Special Agent McKean that if he had trouble selling his share of the cocaine, NAVARRO'S family could purchase all of the cocaine at one time. Special Agent McKean agreed to contact HERNANDEZ when he was notified of a shipment of cocaine. The meeting was then concluded.

70.     On May 24, 2009, ATF Special Agent Steve McKean called JUAN HERNANDEZ at (561) 201-0147. During a recorded conversation, Special Agent McKean advised HERNANDEZ that he expected a shipment of cocaine to arrive the following week. HERNANDEZ stated he was ready to conduct a robbery for the cocaine as previously discussed. The conversation was then concluded.

71.     On May 26, 2009, HERNANDEZ called Special Agent McKean and left a message on Special Agent McKean's voice mail requesting that Special Agent McKean call him. Special Agent McKean returned the call and during a recorded conversation HERNANDEZ asked Special Agent McKean if he had heard any additional information regarding the proposed robbery for cocaine. Special Agent McKean responded negatively and HERNANDEZ stated he was ready, willing and able to commit the robbery for cocaine.

72.     Later the same day, Special Agent McKean called HERNANDEZ. During a recorded conversation, Special Agent McKean advised HERNANDEZ that he had been contacted by the Colombian narcotics trafficking organization and that a shipment of cocaine was scheduled to

arrive the following day. HERNANDEZ excitedly stated he would contact his associates and call Special Agent McKean the next morning.

73.    On May 27, 2009, HERNANDEZ called Special Agent McKean at approximately 9am. During a recorded conversation, HERNANDEZ stated he was not able to sleep the previous evening in anticipation of committing the robbery. HERNANDEZ stated he had "new bullets" and an "extra clip" for use in the robbery. Special Agent McKean stated he would call HERNANDEZ back later in the day.

74.    Later the same day, Special Agent McKean called HERNANDEZ back and during a recorded conversation stated he was working on obtaining a getaway vehicle for HERNANDEZ and his associates. Special Agent McKean stated he would call HERNANDEZ later that afternoon.

75.    At approximately 5:37PM, HERNANDEZ sent a text message to Special Agent McKean stating "Iam on my way 2 u- Azzy ad zae". Special Agent McKean replied "Ok".

76.    At approximately 6:04PM HERNANDEZ sent a text message to Special Agent McKean stating "Were u what me go im down here- Azzy ad zae". Special Agent McKean replied "Let you know in 30 minutes". HERNANDEZ replied "K".

77.    Special Agent McKean then called HERNANDEZ and during a recorded conversation learned that HERNANDEZ was at a Wal-Mart in the area of Sample Road and US 441. Special Agent McKean then directed HERNANDEZ and NAVARRO to meet him at a Mobil gas station in the area of Commercial Boulevard and Nob Hill Road, Tamarac, Florida, so they could follow Special Agent McKean to a business where they could wait for the phone call that would provide the location of the stash house that would be robbed.

16

78.     HERNANDEZ subsequently called Special Agent McKean and advised that he had arrived at the Mobil gas station. Thus, Special Agent McKean, acting in an undercover capacity, arrived at the gas station and initially met with HERNANDEZ and NAVARRO. During a recorded conversation, Special Agent McKean was advised that BRIER was inside the convenience store.

79.     NAVARRO advised Special Agent McKean that he wanted to go over the details of the proposed robbery when they arrived at Special Agent McKean's business. HERNANDEZ and NAVARRO then discussed how they were going to steal Special Agent McKean's vehicle during the commission of the robbery for cocaine. NAVARRO asked Special Agent McKean how much kilograms of cocaine were selling for and Special Agent McKean stated he did not know since he was only a courier for the organization.

80.     BRIER then exited the convenience store and drove a white Toyota truck with HERNANDEZ and NAVARRO as passengers in the truck. The subjects then followed Special Agent McKean to an undercover business facility located in Tamarac, Florida. The subjects then entered the business with Special Agent McKean after Special Agent McKean suggested that they leave their "equipment" to be used for the robbery in their vehicle.

81.     During a video and audio taped meeting, all the parties entered a conference room in the undercover facility. Special Agent McKean asked about the CI and both HERNANDEZ and NAVARRO stated that they did not associate with the CI because they had received information that the CI was providing information to law enforcement. Special Agent McKean advised the subjects that his associates were with the CI and would stay with him until the robbery was successfully completed in order to secure Special Agent McKean's safety and receipt of payment during and after

17

the commission of the robbery. BRIER assured Special Agent McKean would receive his share of the proceeds from the robbery and would not be harmed.

82.     Special Agent McKean asked about AMANDA DIMURO'S role in the proposed robbery and HERNANDEZ stated that DIMURO was going to provide transportation for him the following day after the robbery was completed to aid in distributing HERNANDEZ share of the stolen cocaine.

83.     All parties then entered into discussions regarding how the robbery was going to be conducted. HERNANDEZ stated he did not need to conduct surveillance on the drug stash house and that he and NAVARRO would assault the stash house as Special Agent McKean left with the cocaine he received for transport.

84.     HERNANDEZ advised Special Agent McKean that he was going to steal his rental car and cocaine. HERNANDEZ said he would call Special Agent McKean approximately three hours after the robbery and advise Special Agent McKean where he could meet with HERNANDEZ to receive his share of cocaine from the robbery. HERNANDEZ added that Special Agent McKean could pick up his cocaine the following morning. BRIER told Special Agent McKean to make sure he was not followed by the Colombian narcotics organization when he arrived to meet with HERNANDEZ.

85.     Special Agent McKean then asked for confirmation that he would receive five kilograms of cocaine as payment for his involvement in the robbery and none of the subjects objected. Special Agent McKean added that it would be "pure Colombian coke" and that it had not been "cut".

86.     BRIER stated he had a feeling there would be approximately fifty-five (55) kilograms of cocaine present inside the stash house and Special Agent McKean stated he could only guarantee that there would be at least fifteen (15) kilograms of cocaine inside the stash house.

87.     NAVARRO and HERNANDEZ stated that they were going to lay Special Agent McKean down on the ground and HERNANDEZ added that he was going to use Special Agent McKean as a shield while he cleared the house. HERNANDEZ stated he would grab the cocaine and steal Special Agent McKean's car. NAVARRO added that they would also take Special Agent McKean's phone in order to disguise Special Agent McKean's involvement in the robbery.

88.     NAVARRO asked if Special Agent McKean had a firearm and Special Agent McKean responded affirmatively. Special Agent McKean stated he maintained his firearm inside his vehicle to protect the cocaine he transported.

89.     HERNANDEZ stated that once the garage door was opened they would assault the stash house. HERNANDEZ added that the first reaction of the guard inside the stash house was that "Task Force" officers were raiding the stash house because they would be wearing masks. Special Agent McKean sought confirmation that they had masks available for use in the robbery and was advised that the subjects had masks for use in the robbery.

90.     Special Agent McKean asked the subjects if they had their 9mm pistols. HERNANDEZ assured Special Agent McKean that they had their equipment to conduct the robbery and added that he would "suit up" once Special Agent McKean advised him that he could.

91.     BRIER asked Special Agent McKean if he knew the location of the stash house and

19

Special Agent McKean responded negatively.

92.     HERNANDEZ and NAVARRO then discussed where they could hit Special Agent McKean in order to conceal his involvement in the robbery. HERNANDEZ then advised NAVARRO, "If one of the Colombians move, take him out".

93.     NAVARRO then advised Special Agent McKean that it would be worth receiving a black eye in exchange for his five kilograms of cocaine he would receive for his participation in the robbery.

94.     Special Agent McKean then provided a pre-arranged arrest signal and the subjects were taken into custody by ATF Special Response Team members.

95.     Inside the vehicle driven by the subjects to the meeting, agents discovered 2 9mm pistols, shotgun ammunition, masks, duct tape and flex cuffs.

96.     After being advised of their Miranda rights both HERNANDEZ and NAVARRO gave statements to law enforcement agents admitting their roles in the scheme to steal cocaine.

Wherefore, based on the aforementioned facts, your affiant believes probable cause exists that Juan HERNANDEZ, a/k/a "Jr.," William NAVARRO, a/k/a "Oso," Jonah BRIER and Amanda DIMURO conspired to possess with the intent to distribute fifteen kilograms or more of cocaine and carried and used firearms during the commission of a drug trafficking offense, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846 and Title 18, United States Code, Sections 924(c) and 2.

FURTHER AFFIANT SAYETH NAUGHT.

SETH BERGER
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to and subscribed before me
this 28th day of May 2009.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

21

# **BOND RECOMMENDATION**

<u>JUAN HERNANDEZ, a/k/a "Jr."</u>
Defendant

<u>Pretrial Detention</u> is recommended as to defendant.

ROBERT H. WATERS JR.
ASSISTANT UNITED STATES ATTORNEY

# BOND RECOMMENDATION

WILLIAM NAVARRO, a/k/a "Oso,"
Defendant

Pretrial Detention is recommended as to defendant.

ROBERT H. WATERS JR.
ASSISTANT UNITED STATES ATTORNEY

# **BOND RECOMMENDATION**

<u>JONAH BRIER</u>
Defendant

<u>Pretrial Detention</u> is recommended as to defendant.

ROBERT H. WATERS JR.
ASSISTANT UNITED STATES ATTORNEY

# BOND RECOMMENDATION

AMANDA DIMURO
Defendant

Pretrial Detention is recommended as to defendant.

ROBERT H. WATERS JR
ASSISTANT UNITED STATES ATTORNEY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

### No.   09-8141-AEV

**UNITED STATES OF AMERICA**

vs.

**JUAN HERNANDEZ, a/k/a "Jr.,"**
**WILLIAM NAVARRO, a/k/a "Oso,"**
**JONAH BRIER, and**
**AMANDA DIMURO,**

**Defendants.**
_____/

## CRIMINAL COVER SHEET

1.   Did this matter originate from a matter pending in the Northern Region of the United
     States Attorney's Office prior to October 14, 2003?   _____ Yes   _X_ No

2.   Did this matter originate from a matter pending in the Central Region of the United
     States Attorney's Office prior to September 1, 2007?   _____ Yes   _X_ No


Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

BY:

ROBERT H. WATERS, JR.
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 365483
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel:  (561) 820-8711
Fax: (561) 820-8777
Robert.Waters@usdoj.gov